**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**UNITED STATES OF AMERICA,**

**v.**                                                   **Criminal Action 1:19-CR-55**
                                                        **JUDGE KLEEH**

**RAIMONTE GASTON,**
**TAYSHAWN BLAIR,**

                    **Defendants.**

## REPORT AND RECOMMENDATION RECOMMENDING DEFENDANT'S MOTION TO DISMISS BE DENIED

This matter is before the undersigned pursuant to a referral by United States District Judge Thomas S. Kleeh. On October 10, 2019, Defendants, by and through counsel, filed a Joint Motion to Suppress. (ECF No. 33). This matter is now ripe for a report and recommendation to the Honorable Thomas S. Kleeh. Accordingly, the undersigned **RECOMMENDS** that the Joint Motion (ECF No. 33) be **DENIED** for the foregoing reasons.

## I.      BACKGROUND

### a.  Motion to Suppress

On October 10, 2019, Defendants filed their Joint Motion to Suppress Physical Evidence and argued that the evidence obtained during a traffic stop of Zachary Taylor's vehicle on January 1, 2019, should be suppressed. Defendant first argued that that the traffic stop was initiated without reasonable suspicion because the reasons that the vehicle drifted were beyond Mr. Taylor's control. Defendants stated that a Toyota SUV swerved into his lane which caused Mr. Taylor to "move slightly to the right as a result." ECF No. 33, at 6. Defendants also argued that Patrol Officer Aaron

Lantz was following Mr. Taylor's vehicle too closely and that while maneuvering away from the SUV which cut him off, Mr. Taylor was also concerned about Officer Lantz who was driving closely behind him.

Defendants next argued that Mr. Taylor's consent was coerced, and that Mr. Taylor did not want to consent to search his vehicle. Specifically, Defendants stated that Mr. Taylor did not agree to the search and asked officers if there was a reason for the search. Defendants argued that only after being informed of negative consequences of refusing consent and suggested that the search of the vehicle was inevitable, did Mr. Taylor grant consent. Furthermore, Mr. Taylor only agreed to give consent so that he would be allowed to leave, as the officers previously promised.

Finally, Defendants argued that officers did not have a reasonable articulable suspicion to extend the traffic stop beyond the issuance of a citation for the alleged traffic violation. Defendants proffered that the traffic stop was extended for 30 minutes without justification. Defendants stated that Officer Lantz "took more time than was necessary under the circumstances to complete the mission of the traffic stop." ECF No. 33, at 9.

### b. Government's Response

On October 17, 2019, the Government filed their Response and argued that Defendants' Motion should be denied because the traffic stop was based on probable cause, Defendants' lack standing to challenge the consent of Mr. Taylor's vehicle, Mr. Taylor knowingly and voluntarily gave verbal and written consent for the search, and the officers had reasonable suspicion to justify the three minutes that officers talked with Mr. Taylor.

First, the Government argued that Defendant did not have a reasonable expectation of privacy as he was an occupant of the vehicle and did not have a reasonable expectation of privacy in the vehicle or the items found in the vehicle.

Second, the Government argued that Officer Lantz had probable cause that a traffic stop occurred because Officer Lantz observed Mr. Taylor's vehicle travel outside of its lane twice in violation of West Virginia Code § 17C-7-9(a)(1)-Failing to Maintain a Single Lane of Travel.

Third, the Government argued that based on the totality of the circumstances, the consent provided by Mr. Taylor was knowing and voluntary. The Government argued that Mr. Taylor did ask if there was a reason for the search, in which Officer Lantz responded that "he wouldn't like the answer." ECF No. 34, at 9. Then following Officer Lantz's reminder to Mr. Taylor that he was merely seeking consent to search the vehicle, Mr. Taylor gave verbal consent followed by written consent.

Fourth, the Government argued that Officer Lantz had reasonable articulable suspicion beyond the traffic stop because he had been observed Defendants Gaston and Blair participating in the illegal distribution of heroin. The Government stated that based on their previous investigation that day, there was reasonable articulable suspicion that Defendants had committed a crime that allowed for Officer Lantz to detain Defendants Gaston and Blair during the traffic stop.

c.    **The Testimony**[1]

During the hearing, the Government called Aaron Lantz, Bridgeport Police Department testified regarding the events on January 1, 2019. Officer Lantz testified that he is also a member of the Mountaineer Highway Interdiction Team-South (hereinafter "MHIT") and has been working with them for over three years. (FTR Recording 10:05 AM, November 12, 2019, Clarksburg, Third Floor Courtroom)[2]. Officer Lantz testified that received information from an off-duty police officer

---

[1] The testimony of Officer Lantz during the Motion Hearing was sometimes out of order. For clarity of the record, the undersigned presents the testimony in the most easily understood way. However, the substance of the testimony is in no way altered by the undersigned's presentation of the testimony.
[2] This citation has been shortened throughout the entire Report and Recommendation.

3

who was at the WV Fitness 24 working out and advised Officer Lantz that there was a suspicious vehicle in the parking lot. (10:06). Officer Lantz observed the vehicle for himself and noticed the vehicle was "double parked." Id. Officer Lantz testified that there were two individuals, later identified as Brandon Williams and Atisha Wilkinson, in the vehicle with the windows rolled down and that they were smoking. Id. Officer Lantz testified that a light-skinned male exited WV Fitness 24 and approached the vehicle. (10:07). The male, later identified as Blair, spoke with Brandon Williams before entering the back of the vehicle. Id. Defendant Blair exited the vehicle and went back into the gym. Id. The vehicle left the parking lot and Officer Lantz followed it. Officer Lantz then conducted a traffic stop for failing to stop at the entrance of a private drive before turning on to a public road and failure to obey a traffic device.

During this traffic stop, a K-9 sniff was conducted, and the dog alerted. The dog sniff was conducted by Deputy Zack Barker, Harrison County Sheriff's Department. (10:10). The vehicle was searched and 13 Tramodal pills were found within the passenger, Ms. Wilkinson's, coat pocket. Ms. Wilkinson was subsequently interviewed at the Bridgeport Police Department. (10:07). Ms. Wilkinson admitted that she had heroin stamps in her bra which was retrieved by a female officer. (10:10). The stamps were marked "Call of Duty." Ms. Wilkinson then identified Defendants Gaston and Blair as her dealers. (10:11). Ms. Wilkinson showed Officer Lantz a photograph of the Defendants together and showed him text messages between her and Defendant Gaston. Id.[3]

Officer Lantz testified that the area is prone to criminal activity due to the location because its near two major interstate highways and the amount of traffic within the area due to local

---

[3] The Government's Exhibit 1 (3 pages) contained the photographs and text messages provided by Ms. Wilkinson to Officer Lantz. The Government also admitted Exhibit 2, which was the entire dashboard camera footage of the traffic stop. Clips of this video was played throughout the hearing.

businesses, people could go unnoticed. (10:08). Officer Lantz testified that he had previously have several complaints and investigations in the area. (10:09).

Officer Lantz testified that Ms. Wilkinson admitted that she had previously purchased controlled substances from Defendant Gaston but on this particular occasion she purchased from Defendant Blair. (10:14). Officer Lantz also testified that there were other officers at the Bridgeport Police Department (Sgt. Carpenter and Detective Rogers) who had prior knowledge of Defendant Gaston and informed Officer Lantz of his alleged gang affiliation and his alleged proclivity to carry firearms. Id. Detective Rogers was previously assigned to the Greater Harrison County Task Force, which was how Officer Lantz was provided the information. (10:15). Detective Rogers told Officer Lantz that Defendant Gaston had previous firearm charges and was known to carry firearms. (10:16).

Officer Lantz testified that he then continued surveillance at the WV Fitness 24 for approximately two hours. Id. Defendants eventually left the gym and entered the same car. The vehicle eventually left the gym's parking lot and traveled North on I-79, and Officer Lantz followed. Id. Officer Lantz testified that he was driving in an unmarked police SUV. (10:20). Officer Lantz testified that he witnessed the vehicle drift into the right lane, over the line, twice— W. Va. Code 17C-7-9 (10:17, 10:19). Officer Lantz testified that there was no reason for Mr. Taylor's vehicle to veer into the next lane. (10:19). Officer Lantz testified that he initiated a traffic stop on the vehicle at the mile marker 123 and the vehicle pulled over at the rest stop on I-79 North. (10:16). Officer Lantz's testified that his main concern was whether the driver was under the influence, texting while driving, or driving while distracted. (10:19). Officer Lantz testified that he initiated contact with the driver, Zachary Taylor, who appeared very nervous. (10:17). Defendant Gaston was in the front passenger seat and Defendant Blair was in the back-passenger

side of the vehicle. (10:26). Officer Lantz informed Mr. Taylor the reason he pulled Mr. Taylor over. (10:28). Officer Lantz obtained Mr. Taylor's license and registration and returned to his vehicle to enter the information and search for warrants. Id.

At this point, other officers arrived on scene who attempted to identify the passengers. (10:28). Officer Lantz testified that he requested the use of a K-9, however, one was unavailable at that time (10:17). Mr. Taylor's license was valid and returned to the vehicle. (10:29). Officer Lantz had Mr. Taylor exit the vehicle and told Mr. Taylor that he was going to issue him a citation. (10:29). Officer Lantz testified that he made small talk and then requested consent to search the vehicle. Id. Officer Lantz testified that Mr. Taylor first gave oral consent to search the vehicle followed by written consent to search after speaking with Officer Lantz. (10:17). Officer Lantz testified that he filled the form and read Mr. Taylor his rights prior to him signing the form. (10:40). The officers then removed Defendants from the vehicle and conducted pat downs of them. (10:41). Officer Lantz stated that after Defendants were taken out of the vehicle, a K-9 arrived to do a free air sniff. Id. Officer Lantz testified that the search of the vehicle rendered 279 stamps of heroin, which were marked "Call of Duty." Defendant Blair had $294.00 and 2 cellphones on his person. (10:44).

On cross-examination by Defense Counsel Walker, Officer Lantz testified that he is employed by the Bridgeport Police Department but essentially acts as a State Trooper in the area. (10:45). Officer Lantz testified that he was a patrolman for approximately two years before being chosen for MHIT. (10:47). Officer Lantz testified that he receives annual training in interviews, roadside interdiction, and surveillance. Id. Officer Lantz testified that he received on the job training for approximately one year. (10:49). Officer Lantz testified that on January 1, 2019, he received a phone call from Officer Satterfield regarding the suspicious vehicle followed by a text

message containing the photograph of the vehicle. (10:50). Officer Satterfield called him personally, and that Officer Lantz often gets notifications of drug complaints personally. Officer Satterfield said that the vehicle seemed out of place, the car was double parked, and the occupants were smoking. (10:51). The occupants of the vehicle did not come in or out of the vehicle. (10:52).

Officer Lantz testified that no one had made a complaint about the vehicle being double parked. (10:53). Officer Lantz parked in the parking lot of the Sleep In store, which faced the parking lot of the WV Fitness 24. (10:54). Officer Lantz testified that the vehicle appeared to be waiting on someone and that their presence in the parking lot was suspicious because they did not exit their vehicle to enter the gym. (10:55). Officer Lantz testified that there have previously been issues with vehicles conducting drug sales. Id. Officer Lantz stated that he could have approached in the parking lot but did not because he did not feel comfortable approaching the car. (10:57).

Officer Lantz testified that he followed the vehicle a couple hundred yards and then turned right onto Lodgeville Road. (10:58). Officer Lantz stated that he was following the vehicle because he saw activity that was consistent with a drug transaction. Id. Officer Lantz testified that if there was no reason to pull them over, he would have stopped following them. Id. Officer Lantz testified that he initiated the traffic stop for the driver's failure to stop when exiting a private drive onto Talley Drive. (10:59). Officer Lantz testified that he did not pull the vehicle over immediately because he was using officer discretion to find a location that was suitable to initiate a traffic stop. (11:00). Officer Lantz testified that there was a second traffic violation—Failure to Obey a Traffic Control Device. (11:01).

Officer Lantz testified that he believes it to be a high-drug activity area and has initiated approximately ten to twenty drug arrests within the area since he's begun his work on MHIT, although he does not know the frequency of other types of crimes that occur in the area. (11:03).

7

Officer Lantz stated that he did not know Defendant Gaston prior to the stop of his vehicle. (11:06). Rather, Officer Lantz knew of him because Ms. Wilkinson identified him, and Sgt. Carpenter and Detective Rogers provided Officer Lantz with information about Defendant Gaston. (11:07). Officer Lantz was informed that Defendant Gaston was known to carry firearms and was affiliated with a gang. Id. Officer Lantz testified that he did not check Defendant Gaston's criminal history but was told that Defendant Gaston had prior firearm charges. Id. Officer Lantz testified that Defendant Gaston was a part of the "ATM gang," out of Pittsburgh, which stands for "About that money." (11:08). Officer Lantz testified that a YouTube video was previously made, and Defendant Gaston was shown holding a firearm. Id.

Officer Lantz testified that he was following the vehicle until there was a traffic infraction due to the totality of the circumstances. (11:09). Officer Lantz testified that he was traveling approximately two car lengths behind Mr. Taylor's car on I-79. (11:10). While driving down I-79, a white SUV drove past both Mr. Taylor and Officer Lantz and eventually merged in front of Mr. Taylor's car. (11:11). Officer Lantz testified that the white SUV was approximately one to two car lengths in front of Mr. Lantz. Id.

When speaking to Officer Lantz, Mr. Taylor denied any knowledge of drugs in the vehicle. (11:14). Officer Lantz testified that he filled out the form by his car as he was talking to Mr. Taylor about the contents of the form. (11:16). Officer Lantz testified that he read the top portion of the form to Mr. Taylor but did not review the portion that "describe[d] the person or premises to be searched" portion of the form. Id. Officer Lantz testified that he did not know whether Mr. Taylor read the portion of the consent for which states that the officers would search "any and all items in the vehicle." (11:18).

Officer Lantz testified that he patted down Defendant Gaston upon his removal from the vehicle. (11:18). Officer Lantz testified that Defendant Gaston was wearing a large winter jacket, in which "a lot of items in his pockets of his jacket." Id. Officer Lantz went through the jacket after the pat down to give Defendant Gaston back his jacket. (11:19). Officer Lantz testified that the purpose of the pat down was for safety. Id. Officer Lantz stated that he requested that Defendant Gaston take off his jacket at which time he placed the jacket on top of the vehicle. (11:21). Officer Lantz testified that he did not find any weapons on his person. Id. After patting down Defendant Gaston, the jacket was searched and was eventually given back to Defendant Gaston. Id. Officer Lantz testified that Defendant Gaston did not consent nor request that officers search the jacket. (11:22). Inside the jacket, officers found $1,622.00 in U.S. currency and a money order sent to Defendant Blair. Id. These items were located inside two different pockets. (11:22). Officer Lantz testified that when he "threw the jacket" on to the top of Mr. Taylor's vehicle, he saw the cash in the pocket. Id. He then took the cash out of the pocket and made sure everything else was out of the pocket before handing him back the jacket to Defendant Gaston. (11:23). Officer Lantz testified that he did not believe the cash to be a weapon, nor did he believe the money order to be one either. Id.

On cross-examination by Defense Counsel Dyer, Officer Lantz testified that Defendant Blair owned the backpack because he had it on in the gym and had it on while sitting in the backseat of Mr. Taylor's car. (11:33). Officer Lantz testified that he was not the officer to ask him to step out of the vehicle and does not know whether the officer told him to leave the backpack in the vehicle. Id. Officer Lantz testified that he believed Mr. Taylor's consent permitted them to search the drawstring backpack. (11:34).

On re-direct, Officer Lantz testified that he witnessed Defendant Blair with the backpack while getting into Mr. Taylor's vehicle. (11:35). Officer Lantz testified that its common to find large amounts of money with drug investigations. (11:36). Officer Lantz testified that Defendant Gaston had a prior federal conviction. Id. Officer Lantz also testified that he saw Defendant Gaston in the video with what appears to be a firearm but does not know when the video was made. (11:37). Officer Lantz testified that Defendants Gaston and Blair were going to be arrested following that traffic stop based on the suspicion that they were distributing controlled substances as uncovered during the investigation that day. (11:38). Officer Lantz testified that once would have been arrested, both Defendants Gaston and Blair would have been searched incident to arrest. (11:39). The consent to search was obtained approximately three minutes after Mr. Taylor exited the vehicle. (11:40).

On re-cross-examination by Defense Counsel Walker, Officer Lantz testified that the YouTube video is a music video which depicts disdain for snitches and the individuals depicted in the video possessed firearms. (11:41). Officer Lantz testified that he does not know whether Defendant Blair was ordered to put the bag in the car. (11:43).

## II.    ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "Stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." Delaware v. Prouse, 440 U.S. 648, 654 (1979).

### a.   The Traffic Stop

A law enforcement officer is permitted to stop a vehicle when he or she sees that vehicle violate a traffic law. See United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); see also United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (A traffic stop is reasonable in its inception

"whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted). "In assessing the legitimacy of a traffic stop, we do not attempt to discern an officer's subjective intent for stopping the vehicle. . .. We simply ask whether 'the circumstances, viewed objectively, justify th[e] action.'" Palmer, 820 F.3d at 649.

Officer Lantz initiated a traffic stop pursuant to West Virginia Code Section 17C-7-9, which states in pertinent part:

> (a) Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
>  (1)   A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

W. Va. Code § 17C-7-9(a)(1).

Defense Counsel argued that "drifting" from the lane which an individual is driving in is not prohibited by any West Virginia Law. Defense Counsel argued that Mr. Taylor's vehicle moved slightly to the right due to a Toyota SUV that "cut into the lane ahead of" Mr. Taylor's vehicle. ECF No. 33, at 6.  Furthermore, Defense Counsel argued that Mr. Officer Lantz's police vehicle was following too close behind and that Mr. Taylor attempted to maneuver his vehicle away from Officer Lantz's unmarked police vehicle.

The undersigned finds that Mr. Taylor's vehicle veered out of his lane twice and crossed into the right lane in violation of West Virginia Code Section 17C-7-9(a)(1). Based on the dashcam video admitted as Government's Exhibit 2 and Officer Lantz's testimony, the undersigned finds that Officer Lantz had reasonable articulable suspicion to initiate a traffic stop based on the violation of the traffic code.

### b.  Zachary Taylor's Consent[4]

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128 (1978). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Id. (citing Alderman v. United States, 394 U.S. 165 (1969)). "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, *one against whom the search was directed*, as distinguished from one who claims prejudice only through the use of evidence gather as a consequence of a search or seizure directed at someone else." Rakas, 439 U.S. at 134-35 (emphasis in original).

Defense Counsel argued that the consent of Zachary Taylor to search the vehicle was coerced. Neither Defendant has standing to make such a challenge. See Rakas, 439 U.S. at 128; United States v. Rusher, 966 F.2d 868 (4th Cir. 1992). Hypothetically, if Zachary Taylor's Fourth Amendment rights were violated by the coerced consent obtained by law enforcement, it is Zachary Taylor who could challenge the search of the vehicle—not mere passengers. Accordingly, the undersigned **FINDS** that Defendants do not have standing to challenge Zachary Taylor's consent, whether coerced or not.

### c.  Detention of Blair and Gaston

A traffic stop must also be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." "With regard to scope, 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's

---

[4] Defendants Gaston and Blair cannot challenge the consent of Mr. Taylor as neither has standing to do so. However, both can challenge their length of detention during the traffic stop. Both were partially detained pursuant to the consent of Mr. Taylor to search the vehicle. Accordingly, the undersigned will analyze whether the consent was voluntary for this purpose only.

suspicion in a short period of time.'" United States v. Guijon-Ortiz, 660 F.3d 757 (4th Cir. 2011). "If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008) (citing Florida v. Royer, 460 U.S. 491, 500 (1983)). Thus, "a prolonged automobile stop requires either the driver's consent or a '*reasonable suspicion*' that illegal activity is afoot." Branch, 537 F.3d at 336 (citing United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (emphasis added)). Furthermore, passengers of a vehicles during a lawful traffic stop are detained from the time the car pulls over until the end of the traffic stop. Brendlin v. California, 551 U.S. 249 (2007).

During this traffic stop, Officer Lantz possessed both Mr. Taylor's consent to search the vehicle and reasonable articulable suspicion that there was ongoing criminal activity and detained Defendants based on both these reasons.

### i.    Consent

In determining the voluntariness of consent, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact was voluntary or coerced." Schneckloth v. Bustamonte, 412 U.S. 218, 232 (1972). While the individual's knowledge of right to refuse a search is a factor, an individual's lack of knowledge of that right does not invalidate consent. Rather, the Court's analysis will also determine whether the consent was "the result of duress, or coercion, express or implied." Id.

During this traffic stop, Officer Lantz obtained consent to search Mr. Taylor's vehicle twice—once oral, once written. Beginning at approximately 11:00 minutes into Government's Exhibit 2, Mr. Taylor was requested to exit the vehicle to speak to Officer Lantz.

Lantz:         Is there anything in the car that shouldn't be there?

Taylor:        No, sir.

Lantz:         No drugs, guns, anything like that?

Taylor:        No, sir.

Lantz:         There's a K-9 coming out, okay? Not going to hit on it? You smoke
               weed anything like that?
. . .

Taylor:        Used to.

Lantz:         Hey, you care if we go through it?

Taylor:        Well [pause] is there a reason why?

Lantz:         Well [pause] if I told you, you wouldn't like it.

Taylor:        What's, what's the deal there?

Lantz:         I know who those two are man. I've been watching them all day.

Lantz:         I don't want to see you get hemmed up. They, they probably have
               something on them. I don't want to see you get hemmed up in
               something stupid. Cuz you've had your fair share of trouble,
               correct?

Taylor:        mm, yeah.

Lantz:         And you don't want anymore.

Taylor:        No, I don't. I don't need it.

Lantz:         And I don't want to cuz a lot of time its works like this, man, people
               will be that's not mine, that's not mine, well guess what, your
               mom's car, your mom's not in the car.

Taylor:        Right, so in other words I should consent to the search?

Lantz:         I'm not telling you to consent to nothing. I'm asking you to consent
               to search the vehicle and that's it.

[inaudible due to radio chatter]

Lantz:         do you give us consent to search?

Taylor:          Yes, sir.

(Government's Exhibit 2, 10:50 to 13:55).

In addition to the verbal consent, Officer Lantz proceeded to obtain written consent. Government's Exhibit 3 is the BPD 101-CS form that Officer Lantz filled out and the same form Mr. Taylor signed. The Form explained Mr. Taylor's rights to refuse the search, consult with an attorney prior to the search, that the search was made without coercion, and instructions about terminating the search. These rights were verbally explained to Mr. Taylor and Mr. Taylor was presented with the form to sign. Mr. Taylor printed his name, signed the document, and dated the document. Furthermore, the conversation between Mr. Taylor and Officer Lantz prior obtaining the consent was not coerced. Accordingly, the undersigned finds that Mr. Taylor was adequately informed of his right and voluntarily gave Officer Lantz his consent to search the vehicle.

Furthermore, the search of the vehicle, including the red drawstring bag in which the heroin was found is within the scope of the search. "The scope of a search is generally defined by its expressed object." Florida v. Jimeno, 500 U.S. 248 (1991). A "suspect may impose limits on the items or areas subject to the consent search, just as he may refuse to allow any search whatsoever in the absence of a warrant." United States v. Jones, 356 F.3d 529 (4th Cir. 2004) (citing Jimeno, 500 U.S. at 251). "A general consent to search an automobile authorized a search of any container within the vehicle that could contain contraband." United States v. Williams, 159 Fed. App'x 500 (2005) (holding that a defendant did not have standing to challenge a bag in the vehicle, but explaining general rule concerning search of a container) (citing Jimeno, 500 U.S. at 251); see also Jones, 356 F.3d at 534. Furthermore, it is "objectively reasonable for the police to conclude that the general consent to search respondents' car [for narcotics] included consent to search containers

within the car that might bear drugs." <u>Williams</u>, 159 Fed. App'x at 502 (citing <u>Jimeno</u>, 500 U.S. at 251).

The terms of the consent to search the vehicle were clear: officers could search all items that were in the vehicle. Without any limitations or objections from the consenting driver, officers began their search and found controlled substances within the vehicle. The driver gave no indication to the officers that the backpack should not have been searched, <u>United States v. Mendoza-Gonzalez</u>, 318 F.3d 663 (5th Cir. 2003)("A failure to object to the breadth of the search is properly considered an indication that the search was within the scope of the initial consent"); nor provided any limitations to the officers at all. Mr. Taylor signed a written consent form which stated that the officers were going to search "any and all items in the vehicle."[5] Accordingly, the search conducted was reasonable because officers had unimpeded consent to search the vehicle, including containers within the vehicle. Therefore, the undersigned finds that the search was made in within the confines of the consent and that the consent was voluntarily provided.

### i. Reasonable articulable suspicion

Even if there was no valid consent from Mr. Taylor to search his car, there was reasonable articulable suspicion that Defendants Gaston and Blair were involved in criminal activity and could extend the traffic stop. The reasonable suspicion standard is governed by the United States Supreme Court's decision in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) and its progeny. "<u>Terry</u>'s 'reasonable suspicion' standard is 'less demanding . . . than probable cause.'" <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123. In order to justify a <u>Terry</u> stop, "a police officer must simply point to specific and articulable facts, which taken together with rational inferences from those facts," <u>Terry</u>, 392

---

[5] Defense Counsel Dyer asked Officer Lantz whether any officers instructed Defendant Blair to take off the backpack and place it in the vehicle before exiting. Officer Lantz stated that he did not know as he was not the one removing Defendants Gaston and Blair. Upon review of the dash cam video, the undersigned finds that there is no audible request or demand from the officer to Defendant Blair to take off the backpack prior to exiting the vehicle.

U.S. at 21, which evince "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity.'" Wardlow, 528 U.S. at 124 (quoting Terry, 392 U.S. at 27). "[A] police officer must offer 'specific and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." Branch, 537 F.3d at 337 (quoting Wardlow, 528 U.S. at 123; Terry, 392 U.S. at 21). The "proof necessary to demonstrate 'reasonable suspicion' is 'considerably less than [a] preponderance of the evidence.'" Branch, 537 F.3d at 336. Moreover, "'reasonable suspicion' is a 'nontechnical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. (citing Ornelas v. United States, 517 U.S. 690, 695 (1996)).

Officer Lantz's investigation began earlier that day in which he witnessed what he believed to be a drug deal. After initiating a traffic stop of the vehicle, Officer Lantz obtained information that confirmed his belief that a drug deal occurred, and the purchaser admitted to the purchase from Defendant Blair and previously purchased from Defendant Gaston. Ms. Wilkinson provided text messages, pictures of Defendants, and admitted to the additional purchase of heroin, which she stored in her bra. The area was also known to Officer Lantz to be a "high" drug activity area due to the schematics of the shopping area and its proximity to two major highways. After hours of surveilling the WV Fitness 24 and Defendants (who were inside the gym), Officer Lantz then saw both Defendants enter a vehicle which drove away from the gym. The totality of the circumstances suggests that there was criminal activity afoot, mainly the distribution of heroin, between at least Defendant Gaston and Blair, and potentially the driver of the vehicle, Zachary Taylor. Accordingly, Officer Lantz had reasonable articulable suspicion to extend the traffic stop beyond its initial reason for inception—citing Mr. Taylor for violation of West Virginia Code Section 17C-7-9(a)(1).

17

### d. Frisk of Defendant Gaston[6]

"To be clear, the general risk that is inherent during a traffic stop does not, without more, justify a frisk of the automobile's occupants." United States v. Robinson, 846 F.3d 694, 700 (4th Cir. 2017) (en banc). For an officer to conduct a lawful frisk, "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." United States v. George, 732 F.3d 296 (4th Cir. 2013). The officer does not need to know with absolute certainty, but rather "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. (quoting Terry v. Ohio, 392 U.S. 1 (1968)). The officer must have "particularized and objective basis" in their belief that the suspected might be armed and dangerous. Id. (citing United States v. Arvizu, 534 U.S. 266 (2002)). Factors to be considered, include context of the stop, the crime rate, and nervous or evasive behavior of the suspect, and suspicious movements of the detained. George, 732 F.3d at 296.

Officer Lantz testified that he believed Defendant Gaston to have a previous firearm conviction and was shown a YouTube video, or music video, in which Defendant Gaston was holding what appeared to be a firearm. Furthermore, Officer Lantz was told that Defendant Gaston was a part of a gang, located in Pittsburgh, called ATM. Moreover, because Defendant Gaston's jacket was going to be taken off the of the roof of the vehicle and given back to him, he would have had access to anything in the jacket. The undersigned finds that a reasonably prudent man in these circumstances could believe that Defendant Gaston was armed at this time. Thus, a protective pat down, including his jacket, for weapons upon Defendant Gaston's removal from the vehicle was warranted.

---

[6] This argument was not contained in Defendant's brief; however, Defense Counsel went into lengthy questioning during the hearing as to give the undersigned the impression that this was included in Defendants' arguments. For completeness of the Record, the undersigned considers this argument.

During the hearing, Defense Counsel questioned Officer Lantz in length regarding the search of Defendant Gaston's jacket and discovery of the cash money and money order. The undersigned finds that any argument that these two items were unlawfully seized fails. First, the Terry frisk of Defendant Gaston was completed after the consent to search the vehicle was provided. Therefore, the Terry frisk did not affect the decision to search the vehicle; rather the cash money and money order were discovered upon pulling Defendant out of the vehicle to search the vehicle. Thus, the discovery of the money and money does not taint any evidence subsequently discovered in the vehicle.

Second, the cash money and money order retrieved from Defendant Gaston's coat pocket would have been inevitably discovered after search of Defendants upon his arrest and any argument for their suppression should fail. "The [inevitable discovery] doctrine . . . may apply where the facts indicate another search inevitably would have occurred and would inevitably have uncovered the evidence, and that search falls within an exception to the warrant requirement." United States v. Allen, 159 F.3d 832, 841 (4th Cir. 1998) (citing United States v. Cotnam, 88 F.3d 487 (7th Cir. 1996) (evidence was going to be inevitably discovered pursuant to a search incident to arrest)); United States v. Rodriguez, 750 F. Supp. 1272 (W.D.N.C. 1990) (inevitable discovery rule applies when officers searched a defendant pursuant to arrest after officer reached in pocket specifically to obtain bag of cocaine).

Officer Lantz testified that both Defendants Blair and Gaston were going to be arrested following that traffic stop due to the investigation conducted by Officer Lantz that occurred during the day.

> Q:   Based on your investigation that day, umm, which included, umm, the stop of Wilkinson and talking to her about how she had purchased the drugs, right?, in addition to, umm finding the 279 stamped bags of heroin that were marked "Call of Duty," the same as Ms. Wilkinson's stop . . . did . . . based

on those two things which you found on the second stop, were you going to arrest Mr. Gaston and Mr. Blair at that point in time?

A:      Yes, sir.

Q:      And why were you going to arrest them?

A:      It was my belief that they were working together to distribute heroin in this area.

Q:      And again, that was based on Ms. Wilkinson's information and your observations of that deal?

A:      Yes, sir.

Q:      In addition to the text messages you were provided?

A:      Yes, sir.

Q:      In addition to the stamps that were found in the car?

A:      Yes, sir.

Q:      At that point in time, if you were going to place them under arrest would you have searched, umm, Mr. Gaston again?

A:      Yes, sir.

Q:      Would you have searched Mr. Blair again?

A:      Yes, sir.

Q:      Would you have searched Mr. Gaston's jacket, or any other clothing Mr. Blair was wearing, as well?

A:      Yes, sir.

Q:      Is it safe to say once you found the heroin stamps, umm, in Mr. Taylor's vehicle in the backseat in that drawstring bag that that was the time that you made the decision that you were going charge both of them and arrest both of them that day?

A:      Yes, sir.

R 11:37-39.

A *full* search of Defendant Gaston, including his coat, would have been conducted and would have been reasonable upon his arrest. United States v. Robinson, 414 U.S. 218, at 235 (emphasis added); see also Illinois v. Lafayette, 462 U.S. 640 (1983) (discussing unimportance of the search at site of arrest v. stationhouse).   The cash money and money order in Defendant Gaston's coat would have inevitably been discovered and inventoried upon his arrest. Therefore, the Fourth Amendment exclusionary rule is not triggered, and the evidence should not be excluded.

## III.    RECOMMENDATION

The undersigned Magistrate Judge therefore **RECOMMENDS** that Defendant's Motion to Suppress (ECF No. 33) be **DENIED** for the reasons set forth herein.

Any party shall have fourteen days upon entry of this Report and Recommendation to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**   A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted on November 19, 2019

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE